**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1022**

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

and

DRIVERS, CHAUFFEURS AND HELPERS LOCAL UNION NO. 639,

Intervenor,

v.

DAYCON PRODUCTS COMPANY, INC.,

Respondent.

On Application for Enforcement of an Order of the National Labor
Relations Board. (5-CA-35043)

Argued: January 31, 2013          Decided: February 28, 2013

Before NIEMEYER, GREGORY, and DAVIS, Circuit Judges.

Enforcement neither granted nor denied; remanded by unpublished
opinion. Judge Davis wrote the opinion, in which Judge Niemeyer
and Judge Gregory joined.

**ARGUED**: Paul Rosenberg, BAKER & HOSTETLER, LLP, New York, New
York, for Respondent.    Barbara Ann Sheehy, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Petitioner.  John Robert
Mooney, MOONEY, GREEN, BAKER, SAINDON, MURPHY & WELCH, P.C.,
Washington, D.C., for Intervenor. **ON BRIEF**: Lafe E. Solomon,

Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Usha Dheenan, Supervisory Attorney, MacKenzie Fillow, Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.

_____

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

The National Labor Relations Board ("the Board") applies to this Court for enforcement of its decision and order, in which it found that Daycon Products Company, Inc. ("Daycon") committed an unfair labor practice when it unilaterally reduced the wages of eight of its employees. The Board reached this result without applying, distinguishing, or even mentioning the "sound arguable basis" test that Board precedent suggests should apply. We therefore remand this case to the Board for it to apply or distinguish that test.

## I.

## A.

Daycon is a Maryland-based corporation engaged in the manufacture and distribution of janitorial, maintenance, and hardware supplies. At all times relevant to this appeal, Drivers, Chauffeurs and Helpers Local Union No. 639 ("the Union") has represented Daycon's drivers, warehouse employees, and repairmen. Daycon and the Union entered into a series of collective-bargaining agreements ("CBAs"), each effective for a period of several years. One such agreement was in effect from January 16, 2004, through January 31, 2007 (the "2004 Agreement"). The 2004 Agreement was followed by a new CBA ("the 2007 Agreement"), which, by its terms, was effective from March 3, 2007, through January 31, 2010.

Douglas Webber, the Union's business agent, was "the main person for the Union who bargained for" the 2007 Agreement. J.A. 13.[1] During negotiations, Webber requested information on employee wage rates. In response, Daycon sent a chart listing each employee's hire date, job title, and wage rate. J.A. 127. Webber testified that the Union used that chart "to come up with [its] proposals for the successor contract, for a starting point of wages." J.A. 16. As mentioned above, the parties reached agreement. Though the wage rates in the chart were not set out in the 2007 Agreement, the 2007 Agreement did require Daycon to give each employee $0.55 annual raises "to his/her rate of pay." J.A. 141.

Nearly two years into the 2007 Agreement, after looking into an unrelated payroll issue in January 2009, Daycon's human resources director, Jodie Kendall, conducted a general audit of employee wage rates. She discovered that due to clerical errors, eight employees -- all within the bargaining unit – had received raises in 2004 that were slightly greater than those established by the 2004 Agreement. Kendall estimated that as a result of these errors, the employees had been "overpaid to the tune of about $80,000" since 2004. J.A. 57. She then met with Daycon's

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties.

4

president, John Poole, and they decided to reduce the wage rates of the eight employees.

On April 16, 2009, Kendall sent a letter to the affected employees setting out the wage discrepancies and indicating Daycon's intent to "correct[]" the "overpayment." J.A. 200. The following day, Kendall and Daycon's attorney, Jay Krupin, met with Webber to discuss the issue. Webber, who was provided with the April 16 letter at that meeting, stated his view that a wage reduction would violate the then operative 2007 Agreement. In a letter to Krupin dated April 23, 2009, Webber communicated the Union's intent not to "renegotiate the wage rates that [were] agreed upon" in the 2007 Agreement. J.A. 201. On May 1, 2009, Krupin sent Webber a letter setting out the total overpayments, and threatening "to seek recovery for the full amount of overpayments mistakenly remitted to the bargaining unit employees" if "the Union continue[d] to contest [Daycon's] right to correct the error on a going forward basis . . . ." J.A. 203-04.

On May 20, 2009, Kendall sent Webber a fax setting out the pay discrepancies, as well as the "bonus" amounts that Daycon planned to give five of the employees to ease their transition to reduced wage rates. After receiving the fax, Webber called Kendall and told her that the Union did not agree to a bonus or a reduction of wage rates, and would seek to enforce the 2007

5

Agreement. Daycon paid the first of three planned installments of the bonuses on May 22, 2009, when the eight workers' wage rates were reduced. It did not pay the second or third installments.

B.

The Union filed an unfair labor practice charge with the Board on June 4, 2009. The Board's Acting General Counsel then issued a complaint, alleging that Daycon violated the National Labor Relations Act ("the Act") by unilaterally reducing the contractual wage rates of the eight employees.

An administrative law judge ("ALJ") conducted a hearing on the matter on November 9 and 10, 2009. On January 8, 2010, the ALJ issued a decision recommending dismissal of the complaint. The ALJ concluded that Daycon's actions merely "restored the agreed upon wages to conform them to those previously negotiated by the parties." J.A. 81. Accordingly, the ALJ found that Daycon "did not engage in a mid-term modification of the parties' collective-bargaining agreement." Id. In reaching this conclusion, the ALJ relied principally on two Board decisions. First, the ALJ cited Eagle Transport Corp., 338 NLRB 489 (2002), "for the proposition that an Employer's administrative error in a paycheck may be corrected without violating the Act." J.A. 81. Next, the ALJ cited Foster Transformer Co., 212 NLRB 936 (1974),

6

for the proposition that wage rates mistakenly inflated "at some time in the distant past" need not be perpetuated. J.A. 82.

The General Counsel and the Union each filed exceptions to the ALJ's decision. Daycon filed three one-sentence cross-exceptions, one of which challenged the ALJ's rulings limiting questioning of Webber concerning the content of negotiations leading up to the CBAs.

The Board rejected the ALJ's conclusion in a decision issued on August 12, 2011. The Board found that "the current wage actually earned by each employee in early 2007" was "the basis for computing wages and wage rates in" the 2007 Agreement. J.A. 78. "Consequently, once [Daycon] entered into the [2007 Agreement], it was barred from unilaterally altering unit employees' wage rates contained therein." Id. The Board distinguished Eagle Transport and Foster because in neither case was a CBA in effect. J.A. 77 n.3. It noted that the allegation of an unlawful midterm contract modification involved the 2007 Agreement, not the 2004 Agreement, and that it "need not pass here on the question whether [Daycon] could lawfully have corrected its mistake at any point prior to the execution of the [2007 Agreement]." J.A. 77. The Board "disregarded" Daycon's cross-exceptions because it found that they "lack[ed] supporting argument and d[id] not meet the minimum requirements of Sec.

7

102.46(b) of the Board's Rules and Regulations." J.A. 77 n.1. The Board summarized its holding as follows:

> In sum, while the 2007-2010 wage[] rates and subsequent raises for the eight employees in dispute may represent a perpetuation of an erroneous prior pay raise, they nevertheless represent the bargain struck in good faith by the parties. [Daycon] could not thereafter modify those wages during the contract term without the Union's consent. When it did so, it violated Section 8(a)(5) and (1) and Section 8(d) of the Act.

J.A. 78.

Daycon filed a motion for reconsideration, which the Board denied. The Board then applied to this Court for enforcement of its order.[2] The Union filed a separate brief after we granted its motion to intervene; as well, the Board ceded some of its time allotted for oral argument to the Union.

## II.

Daycon's principal argument is that an employer is permitted to reduce unilaterally employee wage rates inflated by an administrative error, regardless of whether a new CBA is executed after the error. Daycon also argues that because the Board interpreted the complaint to allege a contract modification under § 8(d) of the Act, Daycon needed only a

---

[2] Daycon chose not to file a cross-petition for review of the Board's order.

"sound arguable basis" for its interpretation of the contract to avoid a violation.

A.

"Board findings of fact are conclusive as long as they are 'supported by substantial evidence on the record considered as a whole.'" Evergreen Am. Corp. v. NLRB, 531 F.3d 321, 326 (4th Cir. 2008) (quoting 29 U.S.C. § 160(e)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Evergreen, 531 F.3d at 326 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "While the Board may not base its inference on pure speculation[,] it may draw reasonable inferences from the evidence." Overnite Transp. Co. v. NLRB, 280 F.3d 417, 428 (4th Cir. 2002) (en banc) (alteration, ellipsis, and internal quotation marks omitted).

Although questions of law are ordinarily reviewed de novo, if the Board's construction of the Act is "reasonably defensible," Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979), "it is entitled to considerable deference," Bonnell/Tredegar Indus., Inc. v. NLRB, 46 F.3d 339, 343 (4th Cir. 1995). "No special deference is extended to the Board's interpretation of collective bargaining contracts, but courts are mindful of the Board's considerable experience in interpreting collective

9

bargaining agreements." Id. at 343 (citations and internal quotation marks omitted).

"An agency is by no means required to distinguish every precedent cited to it by an aggrieved party." LeMoyne-Owen Coll. v. NLRB, 357 F.3d 55, 60 (D.C. Cir. 2004). "But where . . . a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument." Id. at 61.

Under Section 8(a) of the Act,

It shall be an unfair labor practice for an employer--
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [protecting, among other things, the right to bargain collectively]; [and]

. . .

(5) to refuse to bargain collectively with the representatives of his employees . . . .

29 U.S.C. § 158.

Section 8(d) defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d). "An employer's duty under § 8(d) to engage in collective bargaining prohibits it from unilaterally terminating or modifying a collective bargaining agreement during the effective

10

term of the agreement." Bonnell, 46 F.3d at 342 (citing 29 U.S.C. § 158(d)). Neither party is obligated "to discuss or agree to any modification of the terms and conditions contained in" a CBA. 29 U.S.C. § 158(d). "Moreover, a violation of § 8(d) constitutes an unfair labor practice under § 8(a)(1) and (5) of the Act." Bonnell, 46 F.3d at 343.

Put simply, it is an unfair labor practice for a party to a CBA to modify a term of employment contained in the CBA without the other party's consent.

B.

Daycon first argues that Eagle Transport, 338 NLRB at 493-94, Foster, 212 NLRB at 936, and Dierks Forests, Inc., 148 NLRB 923, 925-26 (1964), establish that "an employer may unilaterally correct an administrative error resulting in employees being paid more than is required under its existing policies." Daycon Br. 10. Notably absent from these cases, however, is an 8(d) analysis discussing an alleged contract modification, like the one on which the Board based its decision here. Indeed, the Board specifically declined to "pass here on the question whether [Daycon] could lawfully have corrected its mistake at any point prior to the execution of the [2007 Agreement]."

As the Board correctly notes in its brief, "Daycon has cited no authority showing that an employer's mistake during a prior contract term excuses a mid-term modification during a

11

subsequent contract signed by the parties." Board Br. 19. We thus have no hesitation in concluding that neither Eagle Transport, Foster, nor Dierks Forests bear on the contract-modification ground on which the Board ruled here.

C.

Daycon also argues that the Board failed to apply the appropriate legal test, which it argues is the "sound arguable basis" test. It further argues that if that test is applied, Daycon satisfies it.

An example of the Board's application of the "sound arguable basis" test is Bath Iron Works Corp., 345 NLRB 499 (2005), enforced sub nom. Bath Marine Draftsmen Assn. v. NLRB, 475 F.3d 14 (1st Cir. 2007). There, the Board stated the test as follows: "[w]here an employer has a 'sound arguable basis' for its interpretation of a contract and is not 'motivated by union animus or . . . acting in bad faith,' the Board ordinarily will not find a violation." Bath Iron Works, 345 NLRB at 502 (citing NCR Corp., 271 NLRB 1212, 1213 (1984)(emphasis added)). The idea behind this test is that "a mere breach of contract is not in itself an unfair labor practice," NCR Corp., 271 NLRB at 1213 n.6, and "the Board will not enter the dispute to serve the

12

function of arbitrator in determining which party's interpretation is correct," id. at 1213.[3]

Though the Board has provided little guidance as to what makes an argument "sound" and "arguable," it has focused on reasonableness, stating that where both parties "present[] reasonable interpretations of the applicable contract language," the employer has a sound arguable basis and there is no unfair labor practice. Bath Iron Works, 345 NLRB at 503. In Bath Iron Works, for example, the central issue was whether the employer violated the Act by merging its pension plan with that of its corporate parent, without the consent of three unions representing the employees. Id. at 499. Each relevant CBA referred to plan documents in the section dealing with employee benefit plans, and two of the three CBAs explicitly stated that the terms and conditions of employee benefit plans were governed by plan documents. Id. at 499-500. The employer cited several articles in the plan documents as a source of authority to implement the merger, and argued that it therefore had a "sound arguable basis" to merge the plans without modifying the CBA. Id. at 500. The General Counsel, on the other hand, argued that the plan documents were not part of the CBAs and did not contain

---

[3] The 2007 Agreement provides for arbitration "[i]n the event of a dispute regarding [its] application or interpretation . . . ." J.A. 157-58.

a right to merge the plan. Id. at 503. The Board concluded that the General Counsel's interpretation was "no more [reasonable] than the [employer's]," and thus dismissed the complaint. Id.

In other cases applying the "sound arguable basis" test to reject the General Counsel's unfair labor practice allegations, the Board has also found the competing contract interpretations to be substantially equally reasonable. See NCR Corp., 271 NLRB at 1213 ("The Board is not compelled to endorse either of these two equally plausible interpretations of the contract's operation in this case."); Vickers, Inc., 153 NLRB 561, 570 (1965) (finding that the employer's interpretation of the disputed contract clause "not only was reasonable . . . but also was an interpretation which found tacit support from the Union's conduct").

In the case at hand, because the Board interpreted the complaint to allege a contract modification under § 8(d), the central inquiry is what wage rates (if any) were embodied in the 2007 Agreement. See 29 U.S.C. § 158(d) (stating that neither party is obligated "to discuss or agree to any modification of the terms and conditions contained in" a CBA). The 2007 Agreement required Daycon to give each employee $0.55 annual raises "to his/her rate of pay." J.A. 141. The Board concluded that, through this language, the 2007 Agreement contained "the current wage actually earned by each employee in early 2007,"

14

when the agreement was executed. J.A. 78. Daycon argues, to the contrary, that "rate of pay" refers to wage rates without the mistakenly given raises.

As noted above, Daycon had provided the Union with a list of employees and their wage rates during negotiations for the 2007 Agreement. We think this fact suggests that both parties understood "his/her rate of pay" to refer to those rates; there is no contrary indication that "rate of pay" refers to the rates that would have existed had Daycon not made the clerical errors years earlier, during the term of the 2004 Agreement. It is thus most probable that the Board concluded that Daycon's interpretation of the CBA was not sound or arguable. (Indeed, counsel so contended at oral argument.) But because the Board failed to even mention the "sound arguable basis" test, let alone apply it, we are left to guess at its reasoning. This Court thus "really has no way of knowing if the rationale it discerns is in fact that of the agency, or one of [our] own devise. Yet only the former can provide a legitimate basis for sustaining agency action." LeMoyne, 357 F.3d at 61.

In one short paragraph in its brief, the Board argues that the contract provides no basis for unilaterally modifying wage rates, and that the Board was therefore permitted to reject Daycon's "strained" argument without even mentioning the test. Board Br. 15. But we think that is an argument as to the result

15

of applying the test, not the <u>applicability</u> of the test itself. Under the circumstances, we think it appropriate to give the Board the chance to expressly apply or distinguish the "sound arguable basis" test.[4]

## III.

For the reasons set forth, the application for enforcement of the Board's order is neither granted nor denied, and the matter is remanded for further proceedings not inconsistent with this opinion. <u>Cf.</u> <u>Manhattan Ctr. Studios, Inc. v. NLRB</u>, 452 F.3d 813, 816 (D.C. Cir. 2006) ("The Board cannot ignore its own relevant precedent but must explain why it is not controlling.") (quotation marks and citation omitted); <u>id.</u> ("If we conclude that the Board misapplied or deviated from its precedent, we often remand with instructions to remedy the misapplication/deviation.").

<u>REMANDED</u>

---

[4] We are satisfied that the Board acted within its discretion in refusing to consider Daycon's cross-exception and denying Daycon's motion to reconsider. We thus decline to conclude, as Daycon argues, that the Board's decision rests on issues which were not fully or fairly litigated.